LANDRY, Judge.
Plaintiff (C & D) brought this action for recognition of its lien and privilege on property of defendant (CHOP), in the sum of $23,845.50, for material and labor allegedly furnished and performed in renovating a building owned by CHOP and known as the Heidelburg Hotel, Baton Rouge, Louisiana. Great American Properties, Louisiana, Inc., (Intervenor), financed the remodeling project and as mortgagee has taken this appeal from judgment in favor of C & D in the sum of $23,736.71 and also recognizing the lien of C & D. We affirm.
The issues presented are purely factual and, to say the least, are in serious dispute. We are also concerned with the issue of witness credibility. Emile Weber, as apparent owner or in control of CHOP, entered into a verbal agreement with one Clyde Vidrine whereby Vidrine undertook to obtain a loan of approximately $600,000.00 for proposed renovation of the former hotel and its conversion into a modern day office building. In consideration of Vidrine’s obtaining the loan and supervising the remodeling work, Weber agreed to enter into a contract naming Vidrine as agent to lease and manage the renovated structure for a percentage of the rent. Vidrine obtained the necessary loan from Intervenor and employed a contractor by the name of Lanier & Associates to perform the work.
The building, a seven story edifice, was old and its interior required extensive renovation, repair, remodeling and renewing for its intended use. Many room walls and hallways were finished with plaster on the walls and ceilings, which finish was in a generally deteriorated and damaged condition. Partitions were moved, ceilings lowered, all windows (which had wooden sashes) had to be taken out, scraped and repainted. Virtually all sash cords were replaced; some window sash weights were replaced. Concrete floors in hallways and rooms required patching of holes preparato *604 ry to laying new carpet. Many interior doors were of the louvered variety and required tedious scraping and sanding prior to repainting. In some rooms and areas, ceilings were lowered and plaster ceiling replaced with acoustical tile. On some floors, hallways were paneled with prefinished paneling; on others, unfinished paneling was used and finished on the job. All bathroom medicine chests were removed and the voids thus created were patched with sheet rock, properly prepared for painting and the sheetrock painted. Extensive patching of cracks in bathrooms was also required. The entire exterior of the building was spray painted with a stucco-like material to hide flaws, cracks and give the structure a newly stuccoed appearance.
C & D was on the job twice. The first time was for a period of three or four weeks, as painting sub-contractor pursuant to a sub-contract with Lanier. As the work progressed, Weber became dissatisfied with the work done as compared to the weekly amounts being expended for material and labor. Suspecting complicity, Weber investigated and became convinced that Larry Hinchcliffe and Lanier were padding expenses and were also involved in some sort of kick-back scheme involving sub-contractors. Weber halted construction and took Lanier and all sub-contractors, including C & D, off the job. Weber and/or Vidrine attempted to continue the project on a limited basis by employing some workmen, including Roy Vidrine (the uncle of Clyde Vidrine). These workmen performed an undetermined amount of work.
Progress of the work under Weber and/or Vidrine apparently did not suit Weber. Convinced that C & D had no part in the wrongdoing he discovered, Weber entered into a verbal contract with C & D, through C & D’s President, O. M. Dry, to finish the building on a cost-plus basis. C & D acknowledges payment of all work done by it as sub-contractor of Lanier. This action is for work done by C & D, apparently as 'general contractor on a cost-plus' basis, the second time C & D was on the job.
The factual disputes present three basic areas of conflict. First, the parties agree there was a cost-plus contract for C & D to complete the entire project. C & D claims the agreement was for the cost of material, supplies, labor, equipment (including leased equipment), insurance, overhead, administrative costs, unemployment compensation paid on behalf of labor, plus a 20% net profit cost override on all the enumerated cost factors. CHOP and Intervenor maintain the contract was for cost plus 15%, which 15% would include all overhead and administrative expense. Secondly, CHOP and Intervenor question the accuracy of invoices reflecting material allegedly incorporated in the work and also the time sheets charging labor costs to the work. Lastly, there is dispute concerning whether work not charged for by C & D was performed the first time C & D was on the job, or was performed during the interval when Lanier stopped work and C & D resumed the project.
The testimony is in irreconcilable conflict regarding the amount of work performed by C & D the second time it was on the job. To help solve the dilemma thus posed, the trial court appointed its own expert to examine the building in the presence of litigants and their attorneys. Said expert testified in effect that C & D had performed work of a value greater than the amount claimed herein.
The record shows that Weber’s agent, Vidrine, arranged for one Elbert Snead to manage the work on behalf of Weber. Both Snead and plaintiff’s bookkeeper, Dave Richmond, testified that all time sheets and invoices presented were checked each week when presented by C & D for payment. The first two weekly presentations were paid in full. Thereafter, one or two checks given by or on behalf of CHOP were returned to C & D as NSF. At least one or two such NSF checks were made good by a note or notes given C & D. Despite these developments, C & D remained on the job, furnishing material and labor and even making some cash advances on behalf of the project.
*605 The trial court found plaintiff’s version of the contract the more credible. He so found because all time sheets were approved by CHOP’s representatives without question until after the work was completed. We find no manifest error in this conclusion. We also find that this conclusion is supported by the testimony of the expert appointed by the Court.
Intervenor contends that the trial court overlooked proof that materials charged to the job were not incorporated therein by ignoring the fact that delivery of approximately 285 gallons of paint was made to the jobsite on the last day of work. Intervenor suggests the impossibility of applying that much paint in one work day. The record shows, however, that the painting was done with one or more power operated paint sprayers. The court appointed expert testified that an experienced crew of four or five men using power spray equipment and proper work techniques could apply that amount of paint in one day.
The remaining issue is whether some of the work charged for by plaintiff was done by other parties, particularly workmen employed by Yidrine during the interval when C & D was not on the job.
Roy Vidrine testified as to work done by him and other workmen on closets and windows His testimony was such that it did not convince the trial court that it left insufficient work to support the charges for labor and material claimed by plaintiff. Moreover, plaintiff produced testimony to show that some of the work done by plaintiff the first time plaintiff was on the job had to be redone because of mildew which developed on the walls and ceilings and in the closets.
It is well settled that in making factual determinations predicated on witness credibility, the findings of the trier of fact will not be disturbed on appeal except on a showing of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973). We find no such error.
The judgment is affirmed, all costs of these proceedings to be paid by defendant Capital House Office Plaza, Inc.
Affirmed.